FILED
United States Court of Appeals
Tenth Circuit

## UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT

**June 30, 2026**

**Christopher M. Wolpert**
**Clerk of Court**

_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

CESAR E. RODRIGUEZ,

    Defendant - Appellant.

No. 25-1266
(D.C. No. 1:24-CR-00210-GPG-1)
(D. Colo.)

_____

### ORDER AND JUDGMENT[*]
_____

Before **HOLMES**, Chief Judge, **MATHESON**, and **FEDERICO**, Circuit Judges.
_____

Cesar Rodriguez was indicted on one count of possession with intent to

distribute a mixture or substance containing a detectable amount of fentanyl, in

violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A)(vi).  Following the district court's

denial of his pretrial motion to suppress, Mr. Rodriguez conditionally pleaded guilty

subject to a reservation of rights permitting him to appeal the district court's

suppression ruling.  He pursues that appeal now.  We conclude that Mr. Rodriguez's

_____

[*]    After examining the briefs and appellate record, this panel has
determined unanimously to honor the parties' request for a decision on the briefs
without oral argument.  _See_ Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G).  The case is
therefore submitted without oral argument.  This order and judgment is not binding
precedent, except under the doctrines of law of the case, res judicata, and collateral
estoppel.  It may be cited, however, for its persuasive value consistent with
Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

suppression motion was properly denied because his encounter with law enforcement after the traffic stop ended was consensual.  Exercising jurisdiction under 28 U.S.C. § 1291, we **affirm**.

## I

Task Force Officer ("TFO")[1] Erik Olson stopped Mr. Rodriguez's car at around 11:00 a.m. on Interstate 70 after observing him commit two traffic violations—that is, continued travel in the passing lane and failure to maintain a single lane.  After making the stop, TFO Olson approached the passenger's side of the vehicle, explained to the driver, Mr. Rodriguez, the reasons for the stop, and asked him for his driver's license, registration, and insurance.  Mr. Rodriguez provided an identification card, registration, and proof of insurance.

Specifically, Mr. Rodriguez provided TFO Olson with a California identification card bearing the name "Alexandro Rodriguez."  Aplee.'s Suppl. R., Vol. I, at 2:50–3:51 (TFO Olson's Body Camera Video, dated Mar. 21, 2024).  When TFO Olson asked Mr. Rodriguez if he was "Alexandro," he responded by saying, "Yeah, Alexandro."  *Id.* at 3:47–3:51.  But because the identification provided was "only an ID card," TFO Olson then asked Mr. Rodriguez if he had a driver's license.  R., Vol. III, at 19 (Suppression Hr'g Tr., dated Jan. 17, 2025).  Mr. Rodriguez indicated he had a driver's license but "just didn't have it on him."  *Id.*  The vehicle

---

[1]    Although employed by the Mesa County Sheriff's Office, TFO Olson was detailed to the Western Colorado Drug Task Force as a K-9 handler and interdiction officer.

was registered to a different "Rodriguez," whom Mr. Rodriguez "claimed . . . was his uncle[]." *Id.* at 33; *see* Aplee.'s Suppl. R., Vol. I, at 2:55–3:07 ("This is my uncle's car.").

After Mr. Rodriguez provided his documents, TFO Olson asked Mr. Rodriguez to come and wait with him in the patrol car while he ran his information through dispatch. Mr. Rodriguez followed TFO Olson to the patrol car and sat in the passenger's seat—with the door open—while TFO Olson ran a records check. While waiting, TFO Olson asked Mr. Rodriguez some questions about his travel plans. Mr. Rodriguez stated that he was traveling from northern California to Colorado Springs, Colorado for work. Specifically, he was heading to Colorado Springs for a tree-cutting job.

Shortly thereafter, dispatch reported that "Alexandro's" license was suspended. TFO Olson asked Mr. Rodriguez about the suspended license; Mr. Rodriguez responded that the license was suspended due to a missed payment.

The pair continued discussing Mr. Rodriguez's reason for travel. Mr. Rodriguez told TFO Olson that his boss for the tree-cutting job was paying him $300 a day and covering his gas expenses. Harboring some doubts about the business sense of Mr. Rodriguez's 1,300-mile-long trip from northern California to Colorado Springs, TFO Olson asked Mr. Rodriguez some follow-up questions about the route taken. In response, Mr. Rodriguez explained he was worried about snow on Interstate 80, so he decided to travel south to Interstate 70. When TFO Olson sought clarification about "what part" of Colorado Springs Mr. Rodriguez was headed to,

3

Mr. Rodriguez responded by saying, "I don't know . . . just a Motel 6." *Id.* at 14:25–14:40.

Before wrapping up the traffic stop, TFO Olson told Mr. Rodriguez that he was only writing him a warning. Further, TFO Olson informed Mr. Rodriguez that "technically . . . I'm not supposed to let you drive. But I'm not going to sit here and babysit you and make you do something different. You know what I'm saying?" *Id.* at 9:20–9:30.

A little while later, as TFO Olson finished writing the warning, he returned Mr. Rodriguez's insurance card and identification. He also returned the vehicle's registration. Thereafter, TFO Olson told Mr. Rodriguez, "Once I give this [i.e., warning] to you, you'll be good to go, okay?" *Id.* at 15:15–15:20. A few seconds later, TFO Olson handed Mr. Rodriguez the warning. *Id.* at 15:35–15:40.

After returning all of Mr. Rodriguez's documentation and providing him with the warning, TFO Olson asked if Mr. Rodriguez was willing to answer a few more questions. Mr. Rodriguez did not leave. Instead, he stayed in the patrol car and continued talking to TFO Olson and answering his questions.

During this continued conversation, Mr. Rodriguez explained to TFO Olson that he took the four-hour-long detour down Interstate 15 to avoid snow. In response, TFO Olson told Mr. Rodriguez that his story about traveling from northern California to Colorado Springs to cut trees for two or three days was not "very logical." *Id.* at 18:13–18:50. After that, TFO Olson followed up by asking Mr. Rodriguez how much longer he had left on the drive to Colorado Springs. Mr. Rodriguez guessed, "like

4

two hours; an hour." *Id.* at 20:52–20:58. TFO Olson informed Mr. Rodriguez that he was still five hours away from his purported destination.

When TFO Olson returned to the subject of the route taken, Mr. Rodriguez admitted to stopping in Los Angeles and smoking marijuana. He also indicated that there was marijuana in his vehicle.

Based on all this, TFO Olson called for backup so that he could turn his attention to running his canine[2] around Mr. Rodriguez's car. The canine alerted. And during the subsequent search of Mr. Rodriguez's car, TFO Olson located several bags containing suspected fentanyl.

## II

Mr. Rodriguez was charged with one count of possession with intent to distribute 400 grams or more of a mixture or substance containing a detectable amount of fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A)(vi). Before the district court, Mr. Rodriguez moved to suppress the evidence discovered during the search of his vehicle. He argued that the traffic stop was unlawfully extended because the encounter was not consensual and TFO Olson did not have reasonable suspicion. The government countered that the continued detention was lawful because TFO Olson had reasonable suspicion of criminal activity, and Mr. Rodriguez consented to additional questioning.

---

[2] TFO Olson had his K-9 partner, Deni, with him in the patrol car. Deni's training as a drug detection dog certified to detect cocaine, methamphetamine, heroin, and fentanyl is not at issue.

5

The district court, in an oral ruling from the bench, denied Mr. Rodriguez's motion after determining (1) TFO Olson had "reasonable suspicion to support the stop,"[3] and (2) Mr. Rodriguez consented to additional questioning.  R., Vol. III, at 104, 109–11. Consequently, the district court concluded the drugs would not be suppressed.

After the district court denied his suppression motion, Mr. Rodriguez entered into a conditional plea agreement wherein he preserved his right to appeal the district court's denial of his motion to suppress.  The district court sentenced Mr. Rodriguez to 120 months' imprisonment.

This timely appeal followed.

### III

On appeal, Mr. Rodriguez does not contest his initial traffic stop.  Rather, he argues *only* that suppression of the drugs is required because TFO Olson "unlawfully extended his detention" in violation of the Fourth Amendment.  Aplt.'s Opening Br. at 1.  In Mr. Rodriguez's view, neither reasonable suspicion nor consent supported his continued interaction with TFO Olson after the lawful actions connected to the

---

[3]    The district court determined that TFO Olson had reasonable suspicion to continue his detention of Mr. Rodriguez based on *inter alia* Mr. Rodriguez's travel plans, mismatched identification, lack of driver's license, "part[ly] false" answers, and his circuitous route.  R., Vol. III, at 94–108.  As explained *infra*, we need not (and do not) reach the question of whether TFO Olson had reasonable suspicion to continue his detention of Mr. Rodriguez due to our ruling on the issue of consent.

traffic stop were completed or reasonably should have been completed.  The government disagrees on both fronts.

## A

In assessing Mr. Rodriguez's appellate arguments, we review questions of law de novo but accept the district court's factual findings unless clearly erroneous. *United States v. Martinez*, 512 F.3d 1268, 1272 (10th Cir. 2008) ("[W]e 'accept the district court's factual findings unless they are clearly erroneous.  The ultimate determination of reasonableness is a question of law reviewable de novo.'" (quoting *United States v. Rice*, 483 F.3d 1079, 1082 (10th Cir. 2007))).  We are also obliged to view the evidence in the light most favorable to the government, as the prevailing party.  *United States v. Canada*, 76 F.4th 1304, 1307 (10th Cir. 2023) ("When reviewing the denial of a motion to suppress, we view the evidence in the light most favorable to the government . . . ." (quoting *United States v. Windom*, 863 F.3d 1322, 1326 (10th Cir. 2017))).

## B

"A traffic stop must be justified at its inception and, in general, the officer's actions during the stop must be reasonably related in scope to the circumstances that initially justified it."  *United States v. Lopez*, 849 F.3d 921, 925 (10th Cir. 2017).  "A stop may, however, be extended beyond that scope if the person stopped consents to the extension . . . ."  *Id.*  Absent reasonable suspicion or consent, then, "[a]n officer's authority to seize the occupants of a vehicle ends when 'tasks tied to the traffic infraction are—or reasonably should have been—completed.'"  *United States v.*

*Cortez*, 965 F.3d 827, 833 (10th Cir. 2020) (quoting *Rodriguez v. United States*, 575 U.S. 348, 354 (2015)).

"[T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop and attend to related safety concerns." *Rodriguez*, 575 U.S. at 354 (citations omitted) (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). As articulated in *Rodriguez*, mission-related tasks include "whether to issue a traffic ticket," *id.* at 355, and those "ordinary inquiries incident to [the traffic] stop," *id.* (alteration in original) (quoting *Caballes*, 543 U.S. at 408)—such as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance," *id.* As such, we evaluate whether a stop was extended "by looking for the '*Rodriguez* moment,' i.e., the moment when the officer extended the stop by engaging in non-traffic inquiries." *United States v. Frazier*, 30 F.4th 1165, 1179 (10th Cir. 2022) (quoting *United States v. Green*, 897 F.3d 173, 179–83 (3d Cir. 2018)); *see United States v. Batara-Molina*, 60 F.4th 1251, 1255 n.1 (10th Cir. 2023) ("This moment that the stop is prolonged . . . is referred to as the '*Rodriguez* moment.'").

## IV

Stated succinctly, "once a traffic stop is completed, the driver must be allowed to leave unless '(1) the officer has an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring, or (2) the initial detention has become a consensual encounter.'" *United States v. Gomez-Arzate*, 981 F.3d 832, 842

(10th Cir. 2020) (quoting *United States v. Bradford*, 423 F.3d 1149, 1156–57 (10th

Cir. 2005)).  Because we hold that Mr. Rodriguez consented to additional

questioning—and because that holding alone is sufficient to dispose of this case—we

have no need to reach the question of whether his continued detention also could be

supported by reasonable suspicion of drug trafficking.[4]  With this in mind, we turn to

our analysis of the dispositive issue in this case: consent.

## A

Consensual encounters between police and citizens "do not implicate the

Fourth Amendment."  *United States v. Hammond*, 890 F.3d 901, 904 (10th Cir. 2018)

(quoting *United States v. Davis*, 94 F.3d 1465, 1468 (10th Cir 1996)).  "A consensual

encounter is the voluntary cooperation of a private citizen in response to

non-coercive questioning by a law enforcement officer."  *Bradford*, 423 F.3d at 1158

(quoting *United States v. West*, 219 F.3d 1171, 1176 (10th Cir. 2000)).

Determining whether the facts establish that an encounter was consensual "is a

matter of applying the law to the facts, which we analyze de novo."  *United States v.

Esparza-Mendoza*, 386 F.3d 953, 957 (10th Cir. 2004); *see United States v. Abdenbi*,

361 F.3d 1282, 1291 (10th Cir. 2004) ("We conduct a *de novo* review of all the

relevant circumstances to determine whether an interaction between an individual and

a law enforcement officer is a consensual encounter that does not implicate the

---

[4]    For the same reason, we have no occasion to address the government's alternative ground for affirmance—*viz.*, that Mr. Rodriguez "failed to show that his detention was the but-for cause of the drugs' discovery."  Aplee.'s Resp. Br. at 15.

Fourth Amendment."). Our task is to "determine 'whether "a reasonable person under the circumstances would believe [he] was free to leave or disregard the officer's request for information."'" *United States v. Mercado-Gracia*, 989 F.3d 829, 836 (10th Cir. 2021) (alteration in original) (quoting *Gomez-Arzate*, 981 F.3d at 842).[5] In performing that task, we consider:

> (1) the threatening presence of several officers; (2) the brandishing of a weapon by an officer; (3) physical touching by an officer; (4) aggressive language or tone of voice by an officer indicating compliance is compulsory; (5) prolonged retention of an individual's personal effects; (6) a request to accompany an officer to the police station; (7) interaction in a small, enclosed, or non-public place; and (8) absence of other members of the public.

*United States v. Rogers*, 556 F.3d 1130, 1137–38 (10th Cir. 2009). "No single factor is dispositive," and the list is "non-exhaustive." *United States v. Woody*, 45 F.4th 1166, 1174–75 (10th Cir. 2022). Instead, "[w]e focus 'on "the coercive effect of police conduct, taken as a whole on a reasonable person."'" *Mercado-Gracia*, 989 F.3d at 836 (quoting *Gomez-Arzate*, 981 F.3d at 842).

### B

Here, the so-called "*Rodriguez* moment" occurred around fifteen minutes into the stop—i.e., the point at which TFO Olson returned Mr. Rodriguez's documents and handed him the written warning. Recall that TFO Olson told Mr. Rodriguez,

---

[5] Mr. Rodriguez argues that we should apply the two-step test set forth in *United States v. McRae*, 81 F.3d 1528 (10th Cir. 1996). However, *McRae* is inapposite because it dealt with consent to a search, not consent to further questioning.

"Once I give this [i.e., warning] to you, you'll be good to go, okay?" Aplee.'s Suppl. R., Vol. I, at 15:15–15:20. And then a few seconds later, TFO Olson handed Mr. Rodriguez the warning. The mission of the traffic stop had then concluded. But, as detailed below, Mr. Rodriguez consented to the extension of his encounter with TFO Olson.

At that moment, TFO Olson was the sole officer present. He did not brandish his service weapon. Nor did he physically touch Mr. Rodriguez. And the record demonstrates that TFO Olson was not aggressive. As the district court found, TFO Olson "talk[ed] in a conversational tone," did not "ever touch[] any weapon," and never "got[] aggressive or forceful." R., Vol. III, at 110–11. These findings of the district court are supported by the record and are not clearly erroneous. *See, e.g.*, *Martinez*, 512 F.3d at 1272.

Additionally, TFO Olson did not retain Mr. Rodriguez's personal effects. The district court found that the return of Mr. Rodriguez's documents favored consent. We agree. The record makes clear that TFO Olson returned Mr. Rodriguez's identification, insurance, and registration roughly ten minutes after initiating the traffic stop. The return of Mr. Rodriguez's documents is of paramount importance since "[w]e follow a bright-line rule that requires the driver's documents to be returned before the stop may be considered a consensual encounter." *Mercado-Gracia*, 989 F.3d at 836 (quoting *Gomez-Arzate*, 981 F.3d at 842). In general, handing back documents is enough to end the detention. *United States v. Mendoza*, 817 F.3d 695, 700 (10th Cir. 2016) ("Ordinarily, 'once an officer returns

11

the driver's license and registration, the traffic stop has ended . . . .'" (quoting *United States v. Moore*, 795 F.3d 1224, 1229 (10th Cir. 2015))); *see United States v. Guerrero*, 472 F.3d 784, 789 (10th Cir. 2007) (explaining that the "handing back of documents" is "enough to end [a] detention"). This factor militates here in favor of concluding the encounter was consensual.

Moreover, TFO Olson never requested that Mr. Rodriguez accompany him to the police station. To the contrary, the entire interaction occurred in a public location—namely, in TFO Olson's patrol car parked on the side of Interstate 70. And as the district court noted, the passenger door of the patrol car door was never closed. *See* R., Vol. III, at 99 ("[Mr. Rodriguez] gets into the passenger front seat but leaves the door open at all times. . . . That door is never closed."). When, as here, an interaction takes place in "a public location such as 'the shoulder of an interstate highway, in public view,'" that points in favor of a determination that the "encounter was consensual." *United States v. Ledesma*, 447 F.3d 1307, 1314 (10th Cir. 2006) (quoting *United States v. Soto*, 988 F.2d 1548, 1558 (10th Cir. 1993)).[6]

---

[6]    Notably, there is no indication that the time of day would have diminished the public's ability to view the encounter. TFO Olson's encounter with Mr. Rodriguez took place before the noon hour, not in the dark of night. The timing of the encounter accentuates its public character and therefore further supports a conclusion of consent. *See United States v. Gregoire*, 425 F.3d 872, 879 (10th Cir. 2005) (holding that the defendant "consented to additional questioning" and commenting that "the trooper's request to ask additional questions came in full daylight on the open road, with no physical restraint or intimidation of" the defendant); *United States v. Lattimore*, 87 F.3d 647, 651 (4th Cir. 1996) (noting as factors in support of consent in a traffic-stop scenario that "[t]he incident occurred on a well-travelled highway, during the middle of the afternoon"); *see also* 79 C.J.S. *Searches* § 171, Westlaw (database updated Apr. 2026) (noting that "[i]n determining

That the questioning occurred in the passenger seat of TFO Olson's patrol car does not cut against consent.  Time and again we have explained that sitting in a patrol car does not signal a lack of consent.  *See, e.g.*, *United States v. Anderson*, 114 F.3d 1059, 1064 (10th Cir. 1997); *United States v. Gigley*, 213 F.3d 509, 514 (10th Cir. 2000); *Bradford*, 423 F.3d at 1158–59.  This is particularly true in this case "because the door to the patrol car was open."  *United States v. Villegas*, 554 F.3d 894, 899 (10th Cir. 2009).

At bottom, each of the *Rogers* factors cuts squarely and forcefully against Mr. Rodriguez's contention that his continued encounter with TFO Olson—beyond the "*Rodriguez* moment"—was not consensual.

## C

In addition to the *Rogers* factors, "[w]e also have considered whether an officer indicated to the person that he is free to leave."  *United States v. Jones*, 701 F.3d 1300, 1313 (10th Cir. 2012); *accord Ledesma*, 447 F.3d at 1314–15.  And, in that regard, our conclusion under *Rogers*—which strongly militates in favor of a consent determination—is bolstered by the fact that TFO Olson expressly told Mr. Rodriguez he was "good to go."  Aplee.'s Suppl. R., Vol. I, at 15:15–15:20.

To be sure, "a police officer is not required to tell someone that he/she is free to leave the scene of a police/citizen encounter."  *United States v. Hunter*, 663 F.3d

---

whether a consent to a search or seizure was voluntary, the focus is generally on," *inter alia*, "the setting in which the consent was obtained," including "the time and place of the encounter").

1136, 1144–45 (10th Cir. 2011). Nonetheless, we have determined that "[p]hrases like 'thank you' and 'have a safe one' signal the end of an encounter," affording a defendant the opportunity to disengage and depart. *Id.* at 1145 (alteration in original) (quoting *Ledesma*, 447 F.3d at 1315). "That's all I've got" is equally sufficient to transform a traffic stop into a consensual encounter. *United States v. Wallace*, 429 F.3d 969, 975 (10th Cir. 2005).

Our decision in *Mercado-Gracia* is particularly informative. There, the officer pulled Mr. Mercado-Gracia over for speeding. *See* 989 F.3d at 832. The officer issued a speeding ticket approximately seven minutes after initiating the traffic stop. *See id.* at 833. Around the same time, he returned Mr. Mercado-Gracia's license, registration, and proof of insurance. *Id.* The officer then told Mr. Mercado-Gracia, "Okay. You're free to go." *Id.* But as Mr. Mercado-Gracia was walking towards his vehicle, the officer called his name—inquiring, "Is it okay if I ask you some questions." *Id.* Mr. Mercado-Gracia obliged; he spoke to the officer for several more minutes. *Id.* at 833–34.

On these facts, we concluded "an objectively reasonable person in [Mr.] Mercado-Gracia's position would have felt free to decline to answer [the officer's] additional questions and go on his way." *Id.* at 837. We rejected Mr. Mercado-Gracia's contrary argument as "unavailing" based on "innumerable . . . cases." *Id.* at 838.

Like in *Mercado-Gracia*, TFO Olson returned Mr. Rodriguez's documents before providing him with a traffic warning. Similarly, TFO Olson told Mr.

14

Rodriguez that he was "good to go." Yet, Mr. Rodriguez—like Mr. Mercado-Gracia—stayed and talked. At this point, the traffic stop was over. Thus, the conclusion is inescapable that TFO Olson and Mr. Rodriguez were engaged in a consensual encounter.

Based on the foregoing, we agree with the district court that an objectively reasonable person in Mr. Rodriguez's position would have felt free to decline to answer any additional questions and go on his way. *See id.* at 837.

\* \* \* \* \*

In sum, the totality of the circumstances overwhelmingly favors the conclusion that Mr. Rodriguez was not unlawfully detained; his interaction with law enforcement—after the permissible purpose of the unchallenged traffic stop had concluded—was consensual. Stated otherwise, Mr. Rodriguez's encounter "falls clearly within the lines of a consensual encounter as drawn by Supreme Court precedent and our own prior rulings." *United States v. Ringold*, 335 F.3d 1168, 1174 (10th Cir. 2003). A reasonable person in Mr. Rodriguez's position would have felt free to leave.

15

**V**

We **AFFIRM** the district court's order denying Mr. Rodriguez's motion to suppress and its resulting judgment.

Entered for the Court

Jerome A. Holmes
Chief Judge